## WHITCOMB v. WHITCOMB ET AL.

FRAUDULENT CONVEYANCE: ALIMONY: HOMESTEAD.

*Appeal from Bremer District Court.*

THURSDAY, OCTOBER 23.

THE plaintiff and defendant Abel Whitcomb were married in 1855. In 1872 said defendant commenced an action to obtain a divorce. It was duly granted.

In November, 1873, the plaintiff commenced an action to set aside the decree of divorce, and asked she be allowed temporary and permanent alimony. The divorce was set aside, and a judgment rendered against Abel Whitcomb for $750 as temporary and $1,500 as permanent alimony, and also for costs. This judgment was affirmed in this court. See 46 Iowa, 437. This action was instituted to set aside a certain quit-claim deed made by the plaintiff to said Abel, because fraudulently obtained, and to set aside a conveyance of certain real estate made by said Abel to the defendant Mores, and to subject the same to the payment of said judgment on the alleged ground that it was made for the purpose of defrauding the plaintiff. It was also sought to subject the homestead of said Abel to said judgment.

The conveyances were set aside, and the defendant Mores alone appeals from that portion of the decree. The relief asked as to the homestead was refused, and therefrom the plaintiff appeals.

*G. C. Wright*, for Mores.

*Starr, Harrison & Danforth*, for plaintiff.

*A. F. Brown* and *A. T. Cole*, for Abel Whitcomb.

SEEVERS, J.—I. It is too late to inquire whether the judgment was properly rendered, or whether the plaintiff was entitled to recover alimony in the action brought to set aside the decree of divorce. Such questions have been heretofore settled. The plaintiff has a right to the use of the same remedies for the enforcement of the judgment as if the parties thereto were strangers to each other, and it had been rendered on a promissory note.

II. The defendant Whitcomb obtained the quit-claim deed from the plaintiff in November, 1871, by the commission of a willful and deliberate fraud. It is unnecessary to refer to the evidence at length bearing upon this question, because Whitcomb has not appealed, and the decree below has conclusively settled this proposition. We only do so for the purpose of saying that we are satisfied Mores had knowledge of this fraud, and aided and abetted therein. There is much evidence pointing in this direction, but that of Slimmer and Wood, the truth of which we have no reason to doubt, closes the door as to any doubt there otherwise might have beeen.

We start, therefore, in the investigation of the main question in this case, with such fraud and knowledge established. In the light of subsequent events there is no doubt such fraud was the preliminary step in the divorce proceeding, which was successfully accomplished with the further knowledge and aid of Mores.

In November, 1873, the action to set aside the divorce and for alimony was commenced. The notice in said action was served on the 3d day of said month. On the preceding 16th day of August Whitcomb conveyed the land in controversy to Mores. At least the deed and acknowledgment is dated then, and Mr. Wright, the notary, testifies that the date is correct and the deed was then delivered. These dates and the evidence of Wright are all that we can rely on with any degree of confidence, as both Mores and Whitcomb are uncertain when or where it was executed. Indeed a stronger expression than this could be used. They are mistaken who drafted the deed, or have purposely stated an untruth. Their testimony on this point is confused, contradictory and unreliable.

The deed was not recorded until November the 8th, five days after the notice in the action to set aside the divorce was served. No satisfactory explanation is given why the deed was not recorded earlier. Whitcomb, at least, had knowledge, at the time the deed was executed, that the probability was the plaintiff would take some steps to obtain her legal rights. On the same day the deed was recorded Mores loaned Whitcomb $800, to secure which a chattel mortgage on personal property was executed, and was placed on record the same day. Under these instruments Mores held the legal title to, and had a lien on, all of Whitcomb's visible property except the homestead. Mores claims to have given Whitcomb a check on a bank for the $800 the mortgage was given to secure. There is evidence tending strongly to show that while this may be true in form, it is substan-

tially false. Mores drew a check for that amount about the time the mortgage was executed. It was not presented for payment until the 11th day of December following, when it was paid. On the succeeding day the same amount of money was credited to Moons. Who the check was payable to, who drew the money thereon, or who made the deposit, the books of the bank do not disclose. No explanation of this transaction is given by Mr. Mores. We cannot but think one was demanded. Because of its absence legitimate inferences may be drawn, prejudicial to Mr. Mores and the *bona fides* of the transaction.

It is singular, and out of the usual course of business, the check should have been held so long, and that the same amount should be deposited the next day after it was paid. We are not impressed with the thought that Mr. Mores' transactions with the bank, or others, were so numerous that all recollection of this transaction should have passed from him. A denial that this check was the one given Whitcomb, and that the loss of books or memoranda prevented him from saying with certainty to whom it was given, would have been better than nothing. The same is true as to the money deposited. The inference, therefore, is legitimate that the check in question was the one given Whitcomb, and that the money paid thereon was deposited the next day to the credit of Mores.

This view is strengthened by the disposition made by Mores of the mortgage, and the conduct of the party to whom he sold it. The mortgage was sold to Bulkins for either $775 or about $450, it is impossible to tell which from the testimony of both Bulkins and Mores. In any event it was sold at a discount, without any satisfactory explanation why this loss was sustained. Bulkins, with the consent of Whitcomb, sold at private sale, from time to time, the property mortgaged, and finally surrenders it to Whitcomb without its being fully satisfied. This whole transaction is so directly opposed to the way business is usually done that we feel constrained to say that while it may be literally true it must be essentially false. This is not all. According to the evidence of Mores and Whitcomb the latter sold the land in controversy to the former for the sum of three thousand dollars, payable in three years, with six per cent interest. Mr. Burr testifies the note given for the purchase money was dated August 16, 1873. Between the 11th and 13th days of December in the same year, Mores and Whitcomb went to Burr's bank, and the latter proposed to sell the note, which is admitted on all hands to have been first-class paper. It will be remembered that the $800 check was presented and paid on the 11th day of December. There was no bargaining or difference of opinion between Burr and Whitcomb as to the amount that should be paid for the note, for Burr testifies that he asked Whitcomb how much he wanted for the note, and "I suppose he said $2,500." This closed the transaction as to the amount to be paid. But the most singular thing is the manner of payment, which was in a certificate of deposit, payable on demand, as we might infer without interest. The note had been sold at a discount of upward of $500, and such was the mode of payment. This is not all. The certificate was held by Whitcomb, or some one for him, until "July or August, 1875," when it was presented and paid. On the 14th day of August Mores paid the note sold to Burr, one year before it was due. Mr. Burr, with unusual liberality,

and a total forgetfulness of business principles, accepts of Mores $2,545.55 in full payment of the note. This, Burr says, was because Mores was a depositor and a valuable customer, hence he accepted the said amount, being upward of $800 less than was legally due him. Why $49.55 was exacted by Burr more than he paid does not distinctly and certainly appear. It is intimated it was done because the bank had to pay a tax on its deposits, or something of the kind. It must not be forgotten that Mores and Whitcomb went to the bank together and were both present when Burr purchased the note. We must not be understood as discrediting Mr Burr's evidence. We incline to think the statements made by him are true, but doubt the reason given for the surrender of the note to Mores, on the payment of the amount stated. That may have been one reason, but there were undoubtedly others. If not, Mr. Burr had better turn his attention to something else than banking, unless this is an exceptionable transaction.

Take it all together, it is so singular and out of the usual course, that, in the absence of any explanation from Mores, we are compelled to believe that the money paid on the certificate of deposit was used to pay the note, he thus getting the land for $49.55. That this amount was undoubtedly repaid him by Whitcomb, in pursuance of a secret understanding we have no doubt, and which existed between them from the beginning of these transactions.

In this we are confirmed by their evidence in relation to the alleged sale and purchase of the land. Neither of them state, with any degree of certainty, when or where the bargain was completed, the price to be paid, or circumstances usually attending transactions of this character. Whitcomb believed the price agreed upon was $4,000, and directed the deed to be prepared. Mores denied, when his attention was called thereto, that he had agreed to pay that sum; that he would not pay more than $3,000, to which Whitcomb, without a word of opposition, or attempt to get more, at once agreed. If this transaction, singular as it is, is in fact true, the confused and contradictory manner it is stated by Mores and Whitcomb renders it unworthy of belief.

There are other circumstances which tend to show the fraudulent character of the sale, to which we have not referred, deeming it sufficient to refer to the prominent evidence on which our conclusion is based.

Many objections were made to the introduction of evidence, and counsel refer thereto in a general way, and claim the court erred in the rulings made. The trial in this court being anew, these rulings are immaterial, as we determine the whole case without reference to what was decided below. In doing so we rely solely on the evidence of witnesses of undoubted credibility, or, at least, on those we cannot doubt have spoken the truth, the admitted facts, documentary evidence, and the evidence of Mores and Whitcomb, and therefrom conclude the alleged fraud has been established.

III. By the plaintiff's appeal is presented the single question whether the homestead can be subjected to the payment of the judgment.

The divorce having been set aside, the relation of husband and wife exists between plaintiff and Abel Whitcomb. The latter, therefore, is the head of a family. The judgment is but a debt, and the plaintiff thereunder is not entitled to precedence, or greater rights than would be the holder of

any other judgment. It was rendered, and the debt contracted, long after the acquisition of the homestead. It cannot, therefore, be made liable to said judgment, except by the written consent of both husband and wife. Code, § 1993. *Byers v. Byers*, 21 Iowa, 268. The judgment of the District Court is, on both appeals,

AFFIRMED.